KINNEY COUNTY LAND CO. et al. v. CUBBAGE.†

(Court of Civil Appeals of Texas. San Antonio. Feb. 26, 1913. On Motion for Rehearing, March 26, 1913.)

1. VENDOR AND PURCHASER (§ 334*) — RECOVERY OF PURCHASE MONEY—GROUNDS FOR RECOVERY—MISREPRESENTATION AND FRAUD.

Defendant copartnership, composed of its original members and their assignees, secured an interest in a tract of 23,000 acres, and by plan of sale proposed to divide it into lots, and after sales, which were to be vigorously pushed, were completed to divide by auction between the holders of purchase contracts, and to execute warranty deeds to trustees for such purchasers, and agreed, in case the auction was prevented, that each holder should have 10 acres in close proximity to a city. All the land was represented to be rich, the price for a lot and a 10-acre farm was $200, less $10 for cash, which figure was changed to comply with a post office department order to provide that any purchaser might pay more than $200, and that the surplus would be divided between all participating in the auction. A number of purchasers executed a waiver to the effect that, should the date of the auction be postponed for more than 30 days, each purchaser would have the right to immediately demand a warranty deed to 10 acres upon a certain part of the tract. The defendants breached their contracts by not pushing sales so as to bring about the auction within a reasonable time, were unable, on account of the post office order, to carry out their contracts as originally made, and did not hold the auction when all contracts had been sold, because of their pending suit to quiet title to 120 acres, which suit they had continued for two years, and, as all land within six miles of the city had been taken up, were unable to give purchasers lots in proximity thereto. Held, that because of these breaches the assignee of purchasers who had signed the waiver, and also of purchasers who had not signed it, was entitled to recover the purchase money.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 959–980; Dec. Dig. § 334.*]

2. PARTNERSHIP (§ 238*) — LIABILITY TO THIRD PERSONS—EXTENT.

Parties who, by purchase of a two-thirds interest, became members, with knowledge of

the obligations of a firm which breached its contracts for the sale of lands, and which was liable to purchasers for a return of the purchase money, were responsible for the entire liability of the firm, and not for only the same proportion they were interested therein.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 491, 492; Dec. Dig. § 238.*]

3. PARTNERSHIP (§ 242*) — APPLICATION OF ASSETS TO LIABILITIES—LIABILITY OF SUCCESSORS.

In an action against the original members of a copartnership and assignees of their interest therein, who, with knowledge of the firm's obligations, had assumed those of their assignors, to recover purchase money because of the firm's breach of its contracts for the sale of land, there was no error in rendering judgment that the original partners recover judgment over against their assignees for all amounts which they were required to pay on the judgment.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 500–508, 1063; Dec. Dig. § 242.*]

On Motion for Rehearing.

4. PARTNERSHIP (§ 242*)—ACTIONS—EVIDENCE —ASSUMPTION OF LIABILITY.

Evidence, including a bill of sale and a deed, *held* sufficient to show that parties purchasing a two-thirds interest in a firm engaged in selling a large tract of land assumed the obligations of their assignors, not only with respect to the uncompleted contracts transferred to them, but as to all of the firm's contracts with purchasers.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 500–508, 1063; Dec. Dig. § 242.*]

Appeal from District Court, Bexar County; J. L. Camp, Judge.

Action by B. H. Cubbage against W. H. King and others, partners doing business as Kinney County Land Company, and others, with cross-action by defendants Howard and King against McCampbell and Hill. From the judgment McCampbell and Howard appeal. Reformed and affirmed.

C. C. Clamp, Joe L. Hill, and Douglas Cater, all of San Antonio, for appellants. T. F. Mangum, R. F. Townsend, Jno. M. Rowland, and R. P. Ingrum, all of San Antonio, for appellee.

MOURSUND, J. B. H. Cubbage, on September 1, 1910, sued W. H. King, R. S. Howard, J. V. Rakestraw, and D. U. Rakestraw, composing the firm of Kinney County Land Company, and Harry Landa, W. T. McCampbell, and Joe L. Hill to recover the sum of $18,000, the aggregate amount paid on contracts made by about 58 people to purchase tracts of land out of the Altito ranch lands in La Salle county, Texas; said claims being assigned to Cubbage, and the contention being that, by reason of breach of contract and misrepresentations expressly authorizing a rescission under the terms of the contract, the plaintiff was entitled to recover the money paid on said contracts.

Upon a trial by the court judgment was rendered, on January 19, 1912, in favor of defendants Landa and Rakestraw and in favor of plaintiff against all the other de-

fendants for $8,564.38; said judgment allowing a recovery on contracts made with 32 persons and refusing a recovery on the remaining contracts sued upon. It was further decreed that if McCampbell and Hill pay the judgment in full they should recover the land covered by the contracts recovered upon, subject, however, to the rights of Landa, if any. Also that defendants R. S. Howard and W. H. King recover judgment over against defendants W. T. McCampbell and Joe L. Hill for all amounts they were required to pay on the judgment. McCampbell and Hill have perfected appeal from the judgment so rendered. No findings of fact and conclusions of law were filed by the trial court.

Findings of Fact.

Harry Landa, the owner of about 23,000 acres of ranch land in La Salle county, known as the Altito ranch, entered into a contract with J. V. Rakestraw, on February 8, 1908, by which the latter was to subdivide said land into about 2,080 tracts and sell the same upon the installment plan at a price which should net Landa $253,000. On March 23, 1908, Landa signed a supplemental instrument, agreeing to make deed to said property to three trustees to be appointed by the buyers of the property.

The Kinney County Land Company, a copartnership firm composed by J. V. Rakestraw, W. H. King, and R. S. Howard, by assignment, became the owners of the rights given J. V. Rakestraw in said contract, and King transferred his one-third interest to Howard, who in turn transferred two-thirds interest to W. T. McCampbell and Joe L. Hill by instruments, as follows:

"Bill of sale to W. T. McCampbell and Joe L. Hill of the following described property: For value received R. S. Howard transfers and assigns all his rights and interest in and to two-thirds of what is known as the Kinney County Land Company, which includes everything, wages and commission that would be due to R. S. Howard with all land, contracts and property, or contract rights of every character in and to the two-thirds interest transferred. Also all interest in and to what is known as the Altito Orchard & Preserving Company. W. T. McCampbell and Joe L. Hill jointly assume the fulfillment of all obligations and contracts transferred to them by R. S. Howard and the payment of all commission due agents in the field on the sale of contracts in connection with the Kinney County Land Company and the Altito Orchard & Preserving Company. Also they agree to fulfill in every detail the affidavit on file at Washington, D. C., with the post office authorities covering any further sales of Altito ranch contracts, and it is understood that W. T. McCampbell and Joe L. Hill understand the nature of the obligations transferred to them by R. S. Howard and

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

also the requirements of the affidavit mentioned above, and the fulfillment of the obligations transferred on the part of W. T. McCampbell and Joe L. Hill is undertaken without recourse. Joe L. Hill. W. T. McCampbell."

Deed. "Know all men by these presents, that I, R. S. Howard, of the county and state aforesaid, for and in consideration of the sum of five thousand dollars to me cash in hand paid and a further consideration of seven notes for the sum of two hundred dollars each, said notes signed by the Southwestern Land Corporation, W. W. Searcy, Jr., W. A. Searcy and J. H. Maudling, and the further consideration of the notes of the grantees herein in various denominations, aggregating the sum of thirty-six hundred dollars, and the further consideration of a deed to 189 acres of land known as Lincoln Park terrace in which I assume the balance due on the purchase money, estimated to be ninety-three hundred dollars, have granted, sold and conveyed, and by these presents do grant, sell and convey, unto W. T. McCampbell and Joe L. Hill, their heirs and assigns, two-thirds interest in the Kinney County Land Company and all interest in what is known as Figdale, or the Altito Orchard & Preserving Company, and I further grant, sell and convey all my rights, title and interest in any and all lands belonging to either of said companies and all lands in what is known as the Altito Ranch in La Salle county, Texas. And this conveyance is intended to include all my interest in said companies and all my interest in the wages, commissions, profits and property rights of myself and W. H. King, the interest of the said W. H. King having heretofore been purchased by me, and it is intended to include all land contracts or property or contract rights of every character and my control or stock of said companies. And I agree to act as agent for the said W. T. McCampbell and Joe L. Hill to sell the contracts for Figdale or the Altito Orchard & Preserving Company, and not to sell any other lands except the 189 acres, and I further agree when called upon to aid them in my support and good faith in selling said land. And the interest hereby conveyed is to include every character of property which I or the said W. H. King have or ever had in either of said companies and every character or right of property ever owned by me in said company or either of said companies or every claim or right acquired either in transfer or contract with any individual member of said company, which is intended to include land, notes, profits, choses in action, property rights, and any official rights that I may have by virtue of being a stockholder or director or officer in either of said companies, and it is intended hereby to subrogate the said W. T. McCampbell and Joe L. Hill to any rights which I may have under or by virtue of any contract, either written or unwritten arising out of any ac-

155 S.W.—38

tion connected with said company or the individual members thereof. I further bind myself to prosecute and defend any actions or suits which may arise or be necessary to make perfect or complete the property rights or other rights conveyed hereunder, and agree that suit or suits may be instituted in my name for the recovery of any property or rights which may have accrued to me and which I, by this instrument, convey to the said W. T. McCampbell and Joe L. Hill, and I bind myself, my heirs and legal representatives, to warrant the title to all of the lands and other property hereby conveyed unto the said W. T. McCampbell and Joe L. Hill, their heirs and assigns, forever. Witness my hand this 5th day of July, 1910. R. S. Howard."

Howard testified regarding said bill of sale as follows: "At the time of this transfer, it embraced our rights under the contract to sell all the land. I conveyed all my rights in the Kinney County Land Company, and they assumed all my contracts."

The Kinney County Land Company, for the purpose of selling the land in compliance with the agreement made with Landa, issued certain booklets containing a description of the land and a plan of sale. In the plan of sale it proposed to subdivide 400 acres into 2,005 town lots, with streets, alleys, and public grounds for schools, churches, and cotton gin, and to subdivide 22,600 acres into 2,005 farms, of which 1,920 were to be of 10 acres each, 50 of 20 acres each, 20 of 40 acres each, 10 of 80 acres each, and 5 of 160 acres each. After all sales were made, the land was to be divided by five land judges. Applications for one lot and one farm were to be sold for $200, less $10 for cash; otherwise $10 cash and 19 monthly notes for $10 each. Upon sale of all contracts warranty deed was to be made to three trustees, "with an abstract to that date, guaranteeing the title to be good and duly vested in them." The land was then to be divided by a fairly conducted auction between the purchasers only as they saw fit. In September, 1909, a change was made, in pursuance of an order of the Post Office Department, providing that if any purchaser desired to bid more than $200 for any lot and farm it could be done, but the overplus would be divided between all of the holders of contracts. No specific time was fixed by the contract in which the sales should be completed, nor was any stated in the literature; but the company agreed that sales would be vigorously pushed by traveling and resident salesmen.

On November 19, 1909, a circular containing the following statement was sent by the company to the purchasers: "Therefore, subsequent to the above, and irrespective as to whether all delinquent applications are disposed of or not, orders for round trip tickets for the use of the representatives will be issued, effective first Tuesday in April, which will allow all representatives to reach Cotulla, Texas, on morning of April 8th, thereby

giving them three days in which to inspect the property, and the auction of the farms and town lots will begin at ten a. m. Monday, April 11th."

Notice was sent out by the company to its purchasers in February and March, 1910, that the contracts had all been sold, and everything was in readiness to hold the auction, except for the fact that 120 acres of the land was claimed by a man by the name of Burwell, who had possession thereof, and against whom suit had been brought for such land. On March 22, 1910, a circular was sent out, stating that the auction had been postponed on account of the suit against Burwell, which would be heard at the October term of court. Howard testified that in 1910 the farms were all sold, and they were ready to hold the auction, except for Burwell. Burwell testified the fence between his land and the Altito ranch land had been there for 28 years, and that he owned the 120 acres claimed by the company and had a deed to it. The suit against Burwell was filed March 16, 1910. Citation was issued September 13, 1910, and returned and filed October 8, 1910. The suit was continued at each term of the court; the record showing that it was by agreement of parties. Burwell testified that, so far as he knew, he had been ready for trial at each term of court since the suit was filed.

McCampbell testified that he did not think over a half dozen contracts had been sold since July, 1910, and since he went in no agents had been employed to sell the same.

Howard admitted he had not sold any contracts since April or May, 1910, although agreeing with McCampbell and Hill to do so as their agent; that in October, 1909, there were about 100 farms to be sold, but now there were 139 to be sold to complete 2,003 contracts.

In June, 1909, an instrument was sent out to be signed by purchasers, which recites that the signers waive the stipulation in the booklet to the effect that the land judges could not be selected until all contracts were sold, and contained a notice that all sales had not been made, but if completed by September 27th the auction would then be held. Such instrument also contained the following clause: "You will also take notice that in the event of failure on the part of any of the five land judges elected to immediately respond to our demand to come at once and judge the property (thereby delaying the survey) or should the surveyor, through some unforeseen cause, fail to complete the survey within the time limit of said contract, the land judges are instructed by you to absolutely equalize the value of all farms and town lots and instruct said surveyor to number same from one up in each section, so that should the date of auction be postponed on account of any of the three above mentioned causes for a period of time exceeding thirty days, each purchaser will have the right to immediately demand of this company a warranty deed to ten acres of land in the western portion of said ranch (covering each application he holds) together with one town lot (on each application) in the townsite of Altito, as this company recognizes each purchaser's rights to possession of his land under section eight, Plat of Sale, page thirty-three of our booklet entitled 'Get a Home in Cotulla,' by first making special waiver of his or her rights of this company to participate in said auction when held."

The land judges were elected, and they divided the land. It was agreed in the booklet that the lots would be numbered consecutively from 1 to 2,005, beginning closest to Cotulla, but this was not done. The company first stated that those signing waiver and asking for land to be allotted to them would not be permitted to select their land, but the same would be allotted closest to Cotulla as the waivers were received. This was not adhered to, and purchasers waiving the auction were in some instances permitted to select their land; in others it was allotted to them. Howard bought and sold contracts for his own benefit, frequently buying for less than $200 and then selling again. McCampbell bought 460 contracts and took them up in a solid block of 4,600 acres in the center of the lands. This land was taken out in January, 1910, and at the time McCampbell, Rakestraw, and Howard formed a corporation called the Altito Orchard & Preserving Company. Landa made a deed to Leavitt for his farm and lot May 9, 1910, also one to McCampbell May 27, 1911. No one was allowed to take over 10 acres if he waived, and if all had waived the auction and taken 10 acres each the company would have had about 2,500 acres left. In the first booklet it was provided that should anything occur, and all the land not be sold, but one or more pieces be sold, they guaranteed to each purchaser a deed to the land he buys, "and to allot each party in the cream of the land near the city of Cotulla, where his ten acres will be more valuable on account of nearness to the county seat." The last booklet issued contained the following provision: "Each applicant buys with the distinct understanding that he is entitled to demand a deed to ten acres of land (on each application he holds) in that portion of the ranch lying nearest to Cotulla, together with one town lot (on each application), in the townsite of Altito, provided said auction is not held within four months from date of his or her application, by first making a special waiver of his or her rights, to this company, to participate in said auction when held." This provision was abandoned. A purchaser was not required to wait four months, but could get his land prior to the expiration of such time. When a man paid $10, he could select and take possession of his farm; but

no title was made to him until he paid same out. At the time of the trial the nearest to Cotulla that a contract holder could get land was six miles. The waiver was not issued under the clause relating to impossibility of selling land, but because the buyers were clamoring for land.

The booklets issued by the company contained the following statement: "Any purchaser who on the day of, and before the division, can show that the owners have in any form or manner in his printed literature, or correspondence, misrepresented this property is hereby absolutely guaranteed the return of the price paid by such purchaser for all lots and farms purchased by said party." Also the statement: "The present owners guarantee a clear and good title to this land." The following are some of the representations contained in the booklets: "The soil varies greatly in its composition, but it is all rich." "Cotton yields on an average of three-fourths of a bale to the acre." The evidence showed that the soil was not all rich, and the yield of cotton in La Salle county was not three-fourths of a bale to the acre prior to, during, or since, the year 1908.

Plaintiff, Cubbage, admitted that when he went back to Beatrice, Neb., he stated the tract as a whole was as good as represented. He testified that he went over the land about April 10, 1910, and at that time a great deal of the ranch next to Cotulla had been taken up; that he did not consider the land that had not been taken up near as good as the land taken up, and told Howard he would not relinquish for the people he represented; that he expected to get his money back, but did not know what the people would do whom he represented. He sold his contract to Howard on May 2, 1910, for $180, and holds the contracts sued upon by assignments by the original holders, made in July, 1910, and thereafter; the same being assigned to him for collection. Plaintiff signed a waiver on June 4, 1909.

Twenty-six of the contract holders, prior to their assignments to plaintiff, signed the waiver hereinbefore mentioned, but never made any demand for their land. Howard testified that some who signed the waivers, he presumed, demanded the money, others the auction, and that some demanded the money, because he did not hold the auction.

The sales to the persons whose contracts are sued upon were made in 1908, except two, early in the year 1909. All were paid out before McCampbell and Hill bought from Howard, except Reimund, Raschke, F. Wipperman, and N. Neilson.

The following signed waivers: L. A. Eastman, Fred Schirrmaher, A. B. Benson, P. C. Allspach, W. H. Striker; C. C. Clampitt, E. C. Geddes, E. F. Nelson, Carl L. Scott, R. P. Thomas, F. W. Meyers, Fred Wipperman, W. J. Raschke, W. H. Alexander, Clayton Barber. C. O. Timmons, P. Y. Gass, John I. McGirr, Stockwell, H. R. Thomas, A. W. Reimund, Howard L. Deshazo, J. E. Davis, Carl F. Debler, Samuel D. Ruth, C. P. Campbell. J. E. Davis held two contracts, J. I. McGirr three contracts, and C. P. Campbell two contracts, and the others each one contract. They held clearance receipts for $200 on each contract, having paid $195 to the company and $5 to the agent.

Those mentioned in the judgment of the court, and upon whose contracts recovery was permitted, did not sign any waiver.

### Conclusions of Law.

[1-3] The court did not err in holding that plaintiff was entitled to recover upon the contracts upon which a recovery was given. Under the contracts existing between the parties the plaintiff was entitled to recover the money for each of the following reasons:

(1) The defendants breached their contract, in that they did not push sales of contracts vigorously by traveling and resident salesmen, and thus bring about, with reasonable dispatch, the conditions necessary to the holding of the auction agreed to be held.

(2) The defendants did not hold the auction at a time when it was ready to be held, and all contracts had been sold, and the only excuse for not holding same was the fact that Burwell claimed 120 acres of the land, which, if it made it impossible to comply with the contract, was by no fault of the contract holders, but was a risk contemplated and assumed by defendants when they guaranteed the title to the land and to furnish an abstract showing good title thereto.

(3) It was impossible for defendants to carry out their contract as originally made, because the Post Office Department required them to change the plan of the auction in a material manner, namely, so as to provide that any contract holder could bid more than $200 for a farm and lot, and the surplus would be divided among all participating in the auction.

(4) Defendants cannot demand that the contract holders take 10 acres because of their inability to hold the auction, because, first, such inability is caused by a defect in defendants' title to 120 acres of land, and they have agreed to continuances of the litigation respecting such land for approximately two years; second, such inability is further caused by their failure to push sales of contracts as provided in the booklets; third, they agreed that each contract holder, in case something unforeseen prevents the auction, should have 10 acres in close proximity to Cotulla, and all land within six miles of Cotulla has been taken up, so that it is impossible for defendants to comply with that stipulation.

(5) The representation made by defendants in their literature, to the effect that three-fourths of a bale of cotton per acre was rais-

ed in La Salle county, was untrue, and entitled the contract holders to recover their money, not because of any reliance upon such representations, but because it was expressly agreed, that if any representation was found to be untrue all money would be paid back.

The court did not err in rendering judgment against McCampbell and Hill, because the evidence shows that they became members of the Kinney County Land Company by purchase of a two-thirds interest in said firm, and as members of a firm they were responsible for the entire debts of the firm, and not for only the same proportion to which they were interested in the firm's business.

The court did not err in rendering judgment over against Hill and McCampbell in favor of Howard and King, because it appears from the testimony of Howard, and is not contradicted by Hill or McCampbell, and also appears from the instruments evidencing the transactions between them, that Hill and McCampbell assumed the obligations resting upon Howard and King with reference to the contracts in question.

The court erred in refusing plaintiff a recovery on the contracts held by the 26 persons who had signed the so-called waiver, for the following reasons: First. Such waiver was not an agreement that the signers dispensed with the holding of an auction, but merely an agreement that the land judges could be appointed at once, and if the auction was postponed more than 30 days the purchasers should have the right to immediately demand warranty deed for 10 acres in the western portion of the ranch, by making special waiver of the right to participate in the auction. Not having waived their right to participate in the auction, they were entitled to have the same held, but only as to the land not allotted to those availing themselves of the privilege of securing their 10 acres, as provided in said instrument. Nor is there any excuse for not holding said auction which can be urged against those who signed the instrument with any more force than those who refused to sign the same. Second. The contract was changed as to these parties by permitting purchasers to select their land, instead of allotting same to them. Third. These contract holders were not precluded from availing themselves of the right to demand the return of their money according to contract because of the untrue representation with respect to the amount of cotton raised in La Salle county.

We see no good reason why these contract holders should not recover their money. The purchasers, after about four years, are apparently no closer to their auction than a year after they bought. In the meantime the owners of two-thirds of the company have taken up about one-fifth of the land in the center of the tract for themselves under contracts they have bought up, and McCamp-

bell has about 85 other contracts which he says are to go into the auction; while their agent, Howard, one of the original promoters of the sale, has been buying and selling contracts for his private profit, instead of bending his energies to the completion of the sale of all contracts, so these persons could have their rights in the land determined by auction.

The judgment of the lower court is therefore, in our opinion, correct in every respect except one, and that is that plaintiff should recover the additional sum of $6,637.50 upon the contracts mentioned in the second last paragraph of our findings of fact as against the defendants, against whom judgment was rendered below, and that King and Howard recover judgment over against McCampbell and Hill for said amount, as well as the amount adjudged in the lower court; and judgment will be rendered by this court making the correction above indicated.

Judgment reformed and affirmed.

FLY, C. J., did not sit in this case.

### On Motion for Rehearing.

MOURSUND, J. Paragraph 5 of our conclusions of law is complained of, on the ground that the representation made did not relate to the property advertised, but was a general representation with respect to La Salle county. This contention is correct, and the paragraph is withdrawn. Many extravagant representations were made regarding land generally in La Salle county and in regard to this particular land, but of those relating to this particular land the only one to which our attention has been called as proven to be untrue is one to the effect that the soil of all of this land was rich. It was also represented that it was as fertile as the valley of the Nile, but there is no evidence with regard to such matter, as even the witness Howard admitted he had not been to the valley of the Nile, but made the statement because from his reading he thought this land compared favorably with the far-famed valley of the Nile.

It is earnestly contended that we erred in concluding that McCampbell and Hill are liable for the entire indebtedness recoverable on the contracts sued upon. It is not disputed that McCampbell and Hill became purchasers of a two-thirds interest in the Kinney County Land Company; in fact, it appears from appellant Hill's testimony, as shown by the last few lines of the statement of facts, they had bought out Rakestraw's interest also in the Kinney County Land Company, in addition to the King and Howard interests. They bought knowing the obligations due by the Kinney County Land Company, or at least with such notice thereof that they are chargeable with knowledge, and we see no reason for changing our conclusion with regard to this matter.

[4] It is also contended that the evidence does not show that they assumed any obligations, except with respect to the contracts transferred to them; that is, those not paid out at the time. The bill of sale provides that they assume the fulfillment of all obligations and contracts transferred to them by Howard, and the sale carried with it the interests in the land which were designed to be awarded to these contract holders whenever an auction should take place. It would hardly be assumed that the interests in the land would be transferred without their assuming the liability towards the contract holders growing out of the contracts for such interests. It is undisputed that they assumed the obligation of holding the auction for all contract holders, and it would be singular if, being obligated to hold such auction as stipulated and agreed by the Kinney County Land Company, yet they should be responsible for the penalty for not holding it only as to those from whom they collected money, and not those who had paid up at the time said McCampbell and Hill became the owners of the interests in the land. Howard testified: "At the time of this transfer it embraced our rights under the contract to sell all the land. I conveyed all my rights in the Kinney County Land Company, and they assumed all my contracts." No objection appears to have been made to this testimony, and we think it can only be construed as a statement that McCampbell and Hill assumed Howard's portion of all contracts made with respect to the rights or interests in lands conveyed to them. In other words, they took his place in the firm. In this connection it appears that this issue was made by Howard and King in their cross-action against McCampbell and Hill, in reply to which the latter filed a general denial. While McCampbell and Hill testified in the case, neither of them mentioned this issue. We are of the opinion that the evidence was sufficient to make out a case against them on the cross-action.

The statement made by us that Howard had been buying and selling contracts for his private profit, instead of employing his energies to complete the sale of contracts, is charged to be in conflict with our finding that all contracts were sold. This is only an apparent conflict, because in fact all contracts were sold at one time, and the auction was agreed to be held at a certain time, but it was not held, and contracts began to lapse faster than they could resell, so that at the date of the trial 139 were unsold, and in the meantime Howard was trading in the same.

While McCampbell and Hill may have paid a high price for the Kinney County Land Company's holdings, and assumed an obligation of something like $16,000 for failure to comply with the contracts made, yet it occurs to us that the most casual reading of the literature promulgated by the Kinney County Land Company would have convinced a person of ordinary prudence that the purchasers would be likely to demand their money back. We can see no injustice in awarding the long-suffering buyers their money and letting McCampbell and Hill, who own and compose the Kinney County Land Company, retain the land contracted to such purchasers. Certainly, if half that was said about the land be true, they will suffer no great loss. It may be unjust, as between them and Howard, that they should suffer the loss; but the evidence, in our opinion, requires the finding that they assumed the obligations that went with the land as to all contract holders.

The motion is overruled.